Michael J. Wernke (*pro hac vice*)
**POMERANTZ LLP**
Email: mwernke@pomlaw.com
600 Third Avenue, 20th Floor
New York, NY 10016
Tel.: (212) 661-1100

*Attorneys for Co-Lead Plaintiffs*
*and Co-Lead Counsel for the Class*

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| CAREY LOWE, Individually and on Behalf of All Others Similarly Situated, <br><br> Plaintiff, <br><br> v. <br><br> TANDEM DIABETES CARE, INC., JOHN F. SHERIDAN, and LEIGH A. VOSSELLER, <br><br> Defendants. | Case No.: 3:23-cv-01657-H-BLM <br><br> **CLASS ACTION** <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS** <br><br> Judge: Hon. Marilyn L. Huff |

# TABLE OF CONTENTS

INTRODUCTION ...........................................................................................................1

SUBSTANTIVE ALLEGATIONS ................................................................................3

I.      Background..........................................................................................................3

        A.      Tandem Repeatedly Issues Guidance Above Market Expectations .....3

                First Quarter of 2022..................................................................................3

                Second Quarter of 2022 ............................................................................3

        B.      Unanticipated Impact of Competition in Q2 and Q3 Renders
                Tandem's 2022 Sales and Revenue Forecasts Unattainable ...............3

II.     Defendants' False and Misleading Statements ...............................................5

                Third Quarter of 2022 ...............................................................................5

                Late-Q3 Analyst Conferences ..................................................................7

III.    The Truth Is Revealed.......................................................................................8

ARGUMENT .................................................................................................................9

I.      Plaintiffs Adequately Allege Materially Misleading Statements ..................9

        A.      Plaintiffs' Former Employee Allegations Should Be Credited ............9

        B.      Misrepresentations That Competition Was "In Line" With
                Defendants' Prior Expectations........................................................... 11

        C.      Misrepresentations About Macroeconomic Headwinds Impacting
                Competition ..............................................................................................13

        D.      Misrepresentations Concerning August "Position Shift" That
                Confirms Assumptions in The Guidance..............................................14

        E.      Financial Guidance and Statements Concerning the Headwinds Being
                Temporary .................................................................................................16

II.    The FAC Adequately Alleges Scienter ........................................................18

    A.    Plaintiffs Allege a Strong Inference of Scienter ................................19

    B.    The Short Time Between Defendant's Reaffirmance of Guidance and The Massive Reduction Supports and Inference of Scienter..............22

    C.    Plaintiffs' Theory Is Consistent with An Inference of Scienter .........23

    D.    The FAC Adequately Alleges Corporate Scienter ............................23

    E.    The Inference of Scienter Is At Least As Plausible as Any Nonculpable Explanation ..................................................................24

III.   The FAC Adequately Alleges Loss Causation ............................................24

IV.    Plaintiffs Adequately Allege a Section 20(a) Claim ...................................25

# **TABLE OF AUTHORITIES**

**Page(s)**

**Cases**

*Abramson v. NewLink Genetics Corp.*,
  965 F.3d 165 (2d Cir. 2020)........................................................................13

*Barry v. Colony NorthStar, Inc.*,
  2019 U.S. Dist. LEXIS 246725 (C.D. Cal. Jan. 24, 2019)................................15

*Brasher v. Broadwind Energy, Inc.*,
  2012 U.S. Dist. LEXIS 55194 (N.D. Ill. Apr. 19, 2012)...................................22

*City of Livonia Employees Ret. Sys. v. Wyeth*,
  2010 U.S. Dist. LEXIS 107729 (S.D.N.Y. Sept. 29, 2010) .............................21

*Cohen v. Nvidia Corp.*,
  135 S. Ct. 2349 (2015)................................................................................23

*Electrical Workers IBEW Local 98 Pension Fund v. Best Buy Co.*,
  958 F. Supp. 2d 1065 BL 207659 (D. Minn. 2013) .........................................13

*Fecht v. Price Co.*,
  70 F.3d 1078 (9th Cir. 1995),
  *cert. denied*, 134 L. Ed. 2d 547, 116 S. Ct. 1422 (1996)...................................22

*Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*,
  104 F. Supp. 3d 441 (S.D.N.Y. 2015) ............................................................13

*Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*,
  270 F.3d 645 (8th Cir. 2001)........................................................................22

*Ford v. Nat. Health Trends Corp.*,
  2016 U.S. Dist. LEXIS 205908 (C.D. Cal. Dec. 5, 2016)................................10

*Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*,
  63 F.4th 747 (9th Cir. 2023)............................................................... 11, 16, 25

*Grossman v. Novell, Inc.*,
  120 F.3d 1112 (10th Cir. 1997).....................................................................15

*Hatamian v. Advanced Micro Devices, Inc.*,
  87 F. Supp. 3d 1149 (N.D. Cal. 2015)..................................................................12

*In re Biomarin Pharm. Inc. Sec. Litig.*,
  2022 U.S. Dist. LEXIS 9445 (N.D. Cal. Jan. 6, 2022) ...............................11, 17

*In re BofI Holding, Inc. Sec. Litig.*,
  977 F.3d 781 (9th Cir. 2020),
  *cert. denied*, 142 S. Ct. 71 (2021) ......................................................................24

*In re Countrywide Fin. Corp. Sec. Litig.*,
  588 F. Supp. 2d 1132 (C.D. Cal. 2008) ...............................................................16

*In re Cutera Sec. Litig.*,
  610 F.3d 1103 (9th Cir. 2010).............................................................................16

*In re Daou Systems, Inc.*,
  411 F.3d 1006 (9th Cir. 2005).......................................................................10, 20

*In re Gen. Elec. Co. Sec. Litig.*,
  857 F. Supp. 2d 367 (S.D.N.Y. 2012) .................................................................20

*In re Grand Casinos, Sec. Litig.*,
  988 F. Supp. 1273 (D. Minn. 1997) .....................................................................22

*In re Harman Int'l Indus., Inc. Sec. Litig.*,
  791 F.3d 90 (D.C. Cir. 2015) ...............................................................................16

*In re Illumina, Inc.*,
  2018 U.S. Dist. LEXIS 10938 (S.D. Cal. Jan. 22, 2018) ......................17, 18, 24

*In re MBIA, Inc., Sec. Litig.*,
  700 F. Supp. 2d 566 (S.D.N.Y. 2010) .................................................................20

*In re Novatel Wireless Sec. Litig.*,
  830 F. Supp. 2d 996 (S.D. Cal. 2011) ..................................................................25

*In re NVIDIA Corp. Sec. Litig.*,
  768 F.3d 1046 (9th Cir. 2014)..............................................................................23

*In re Quality Sys.*,
  865 F.3d 1130 (9th Cir. 2017)................................................................................9

*In re QuantumScape Sec. Class Action Litig.*,
　580 F. Supp. 3d 714 (N.D. Cal. 2022)................................................................10

*In re VeriFone Holdings, Inc. Sec. Litig.*,
　704 F.3d 694 (9th Cir. 2012)..............................................................................19

*Inchen Huang v. Higgins*,
　2019 U.S. Dist. LEXIS 44165 (N.D. Cal. Mar. 18, 2019) ................................25

*Johnson v. Costco Wholesale Corp.*,
　2019 WL 6327580 (W.D. Wash. Nov. 26, 2019) ...............................................10

*Jui-Yang Hong v. Extreme Networks, Inc.*,
　2017 U.S. Dist. LEXIS 64297 (N.D. Cal. Apr. 27, 2017)............................15, 16

*Knox v. Yingli Green Energy Holding Co. Ltd.*,
　242 F. Supp. 3d 950 (C.D. Cal. 2017) ...............................................................15

*Leventhal v. Chegg, Inc.*,
　2024 U.S. Dist. LEXIS 37562 (N.D. Cal. Mar. 4, 2024) ..................................25

*Makor Issues & Rights, Ltd. V. Tellabs Inc.*,
　513 F.3d 702 (7th Cir. 2008)..............................................................................23

*Mazzaferro v. Aruba Networks Inc.*,
　2015 U.S. Dist. LEXIS 15613 (N.D. Cal. Feb. 2, 2015)...................................11

*McGovney v. Aerohive Networks*,
　2019 U.S. Dist. LEXIS 228702 (N.D. Cal. Aug. 7, 2019) ...............................11

*Noto v. 22nd Century Grp., Inc.*,
　2023 WL 122305 (W.D.N.Y. Jan. 6, 2023).......................................................20

*Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*,
　780 F. App'x 480 (9th Cir. 2019) .........................................................................9

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*,
　575 U.S. 175 (2015)......................................................................................12, 14

*Reese v. Malone*,
　747 F.3d 557 (9th Cir. 2014)........................................................................18, 20

v

*Rombach v. Chang*,
   355 F.3d 164 (2d Cir. 2004)..........................................................................................16

*S. Ferry LP # 2 v. Killinger*,
   687 F. Supp. 2d 1248 (W.D. Wash. 2009)......................................................................21

*Shenwick v. Twitter*,
   282 F.Supp.3d 1115 (N.D. Cal. 2017)............................................................................20

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
   551 U.S. 308 (2007)................................................................................................*passim*

*Union Asset Mgmt. Holding AG v. SanDisk Corp.*,
   2016 U.S. Dist. LEXIS 15090 (N.D. Cal. Jan. 22, 2016)...............................................12

## **Rules**

Fed. R. Civ. P. 12..................................................................................................................18, 24

**INTRODUCTION**

Tandem Diabetes Care, Inc. ("Tandem" or the "Company") manufactures and sells insulin pumps for diabetes patients. After a successful 2021, the Company telegraphed strength to the market by issuing annual sales guidance of $845-$860 million – well above analyst expectations – in February 2022, and then revising the guidance upwards to $850-$860 million in May 2022.

Unbeknownst to the public, Tandem was in an extremely vulnerable market position in Q2 and Q3 2022. Tandem's competitors had either just introduced or were about to introduce new products and, consequently, the Company's customers were deferring purchases or outright switching to competitor products. As explained by former employees of Tandem, these market conditions led to a "market pause" which was significantly more severe than the Company had anticipated and heavily weighed on Tandem's sales and revenue throughout 2022.

Defendants[1] did not disclose the true (and permanent) impact competition was having on sales. Instead, on August 3, 2022, when the Company announced Q2 2022 sales below expectations and revised its 2022 sales guidance downward to $835-$845 million, they claimed that it was due to temporary "macroeconomic" conditions, such as inflation, and maintained that the impact from competition was "in line" with what they had always expected. In mid-September 2022, with only three weeks left in Q3 2022, Defendants confirmed that competition was not a concern and that the Company was on track to meet its guidance.

Investors learned the truth on November 2, 2022, mere weeks after reaffirming the $835-$845 million sales guidance (and with only two months left in the year), when the Company significantly reduced its guidance to $800-$805

_____

[1] "Defendants" refers to Tandem, Chief Executive Officer John F. Sheridan ("Sheridan") and Chief Financial Officer Leigh A. Vosseller (Vosseller").

1

million. As a result, Tandem's stock price plummeted nearly 30% to $36.77 per share. Significantly, analysts openly questioned the veracity of managements' prior statements, stating that competition had been "more impactful than they [Defendants] are letting on."

The thrust of Defendants' argument for dismissal is that their statements were not misleading because they disclosed that the Company was facing "headwinds" from competition. This misses the mark. Investors were misled because Defendants falsely reassured them that the impact from competition was no worse than they had anticipated when issuing their guidance at the beginning of the year.

Confronted with corroborating accounts from members of the sales force that the impact from competition was widely known within the Company and that management ignored warnings that the revenue guidance was unattainable, Defendants assert there is no allegation that Defendants themselves ever spoke to the sales force about the impact of competition. Defendants' own Class Period statements belie this assertion. On August 3, 2022, when asked about the impact of competition, Sheridan represented:

> [O]ur -- inside sales organization and our sales force really have active communication dialogue to people who are in the front. And this is what they're hearing. It's really not the competitive issues.

¶59[2] Defendants cannot claim they spoke to the sales force about competition and then deny knowing what sales force said.

At bottom, the question is whether the inference that Defendants knowingly or recklessly misled investors as to Tandem's financial prospects with only three weeks left in Q3 is "at least as compelling" as Defendants' assertion that they were

---

[2] "¶__" or "¶¶__" refers to paragraphs of Amended Complaint for Violations of The Federal Securities Laws ("AC"). ECF No. 16.

completely blindsided by the massive drop in sales that caused them to slash the guidance they affirmed mere weeks earlier. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 324 (2007). Plaintiffs have met their pleading burden.

## SUBSTANTIVE ALLEGATIONS

### I.   Background

#### A.   Tandem Repeatedly Issues Guidance Above Market Expectations

##### *First Quarter of 2022*

On February 22, 2022, Tandem reported its results for 2021 and Q4 2021, announcing 25% year-over-year growth in revenue, 15% growth in pump shipments, and renewal of 60% of the 65,000 pump warranties that expired in 2021. ¶25 Tandem also announced its "2022 Financial Guidance," estimating sales in the range of $845-$860 million and adjusted EBITDA of 14-15% of sales. ¶26

Analysts reacted positively to Tandem's 2022 guidance, which was well above analyst estimates of $827 million, stating that it "surprised to the upside" and raised their 2022 revenue estimates and price target for the stock. ¶¶26-27

##### *Second Quarter of 2022*

On May 4, 2022, Tandem reported its results for Q1 2022, announcing revenue of $175.9 million, shipment of 28,000 pumps (a 12% year-over-year growth), with renewals comprising 20% of U.S. pump shipments. ¶29 Tandem increased its 2022 sales guidance to $850-$865 million. ¶31

Analysts reacted positively to Tandem's announcement, calling it a "solid beat," raising 2022 revenue estimates and noting that renewals were "becoming a larger part of the story" for Tandem given the renewal cycle for 2022. ¶32

#### B.   Unanticipated Impact of Competition in Q2 and Q3 Renders Tandem's 2022 Sales and Revenue Forecasts Unattainable

Tandem entered Q3 2022 facing adverse market conditions arising from (i) competition, (ii) pandemic-related conditions, and (iii) macroeconomic issues. ¶34

3

Competition existed from new pumps entering the market. *Id.* Covid-19 had resulted in staffing shortages in physician offices. *Id.* Macroeconomic issues referred to unemployment, inflation, and the lack of disposable income to spend on new pumps. *Id.* As detailed by members of Tandem's sales force, the impact on sales from competition was much more severe than the Company had anticipated.

Former Employee 1 ("FE1") worked on Tandem's sales force as a territory sales manager in the United States between January 2020 and July 2023. ¶35 Prior to the start of Q3, FE1 spoke with Tandem's Sales Operations Analyst, Darwin Guan, who was responsible for developing the Company's sales targets, and explained that negative market conditions arising from competition were significantly impacting sales. ¶36 Specifically, inflation and unemployment had increased and the upfront cost of Tandem's pump was greater than pumps being sold by the competition. *Id.* In addition, Tandem's competitors Insulet and Medtronic either already released or would soon be releasing new pumps (*i.e.*, the OmniPod 5 and 780G). *Id.* FE1 explained that these factors had caused a "market pause," thereby necessitating a revision to the Company's target sales. *Id.* Tandem's revenue projections during the Class Period were also not realistic because they did not account for negative sales information being provided by the Company's sales force. ¶37

FE1 and other sales force members routinely told senior members of management, including FE1's regional sales manager, that because of competition the sales quotas set by management were too high and that these conditions were going to negatively impact the Company's revenue and earnings more than management was willing to admit. ¶37 These warnings were relayed prior to and during Q3 2022, during biweekly sales force meetings which, in turn, were related to the senior area sales director. ¶37 According to FE1, Tandem's sales force widely

4

knew that the targets for Q3 2022 were not attainable but management and leadership did not change them. ¶¶36-37

Former Employee 2 ("FE2") worked on Tandem's sales force as a sales representative within a Canadian region and corroborated FE1's account that negative headwinds from competition were especially pronounced leading up to and continuing during Q3 2022, given Medtronic's 780G and Insulet's Omnipod 5 insulin pumps on the market. ¶39 FE2 also confirmed that macroeconomic conditions created significant difficulties in terms of competition because Tandem's pumps required a substantial amount of upfront payment relative to the competitor products. *Id.* When setting sales targets for Q3 2022, management did not account for these headwinds even though FE2 repeatedly warned them that the targets were unrealistic in light of the then-existing market conditions. *Id.*

## II.   Defendants' False and Misleading Statements

### *Third Quarter of 2022*

On August 3, 2022, midway through Q3 2022, Tandem issued a press release decreasing its 2022 sales guidance to "the range of $835 million to $845 million." During an earnings call on the same day, Sheridan represented that the reduction was because of "macroeconomic" factors, not competition.

> ***Next is the anticipated dynamic of competition in the United States. This is in line with our expectations*** as it's something we've seen with historical new product launches…***And lastly is the evolving economic environment, including inflation and the threat of recession. Our data suggests that this dynamic began impacting new customers' decision to purchase a pump beginning in the second quarter***…
>
> To better reflect these dynamics, we reduced our 2022 sales guidance by 2%. ***As these challenges dissipate, we look forward to returning to more normalized growth patterns that are driven by the strength of our technology today***.

¶58 (Emphasis added.)

5

During the call, an analyst noted the guidance had a "pretty steep ramp" given the competition in the market and asked whether that would impact sales. ¶59 Vosseller echoed Sheridan's prior reassurances, "***The noise around the competitive launch, particularly right now is more temporary in nature***." *Id*. When another analyst noted that competitors had not "cited to slow down" from the macroeconomic headwinds and questioned whether customers were going to competitor products "where the upfront [cost] is obviously lower", Vosseller again assured investors, "***we don't see these economic headwinds as anything that would shift people's mindset to a different product***" and "***we don't think that this has anything to do with competitive dynamics***." *Id*. Unprompted, Sheridan reassured investors that their reassurances were based on conversations with their sales force:

> I'll also say that our -- inside sales organization and our sales force really have active communication dialogue to people who are in the front. And this is what they're hearing. ***It's really not the competitive issues***. It's more of a -- just the macroeconomic factors.

*Id*.

The takeaway from investors was clear: competition was no danger to Tandem's guidance. Only the temporary impact from inflation was a surprise. As one analyst stated, "Covid and competition impacted Tandem about as expected" but "the softening U.S. economy appears to have caused results here to fall short." ¶43 Another analyst stated, "[COVID] & [competition] were already factored into the guidance, and only [inflation's impact] became apparent in Q2 as the inflationary environment worsened and economy entered technical recession." ¶44 That analyst was nevertheless suspicious, stating that they were "confounded" because "[w]hen guidance was issued on 4Q21 earnings[,] it was noted that competitive 'noise' was factored into the guidance. 2Q22's call featured competition much more than at the noise level." *Id*.

*Late-Q3 Analyst Conferences*

During a September 8, 2022 investor conference, with only three weeks left in Q3, Sheridan reassured investors that a recent "positive shift" in sales confirmed that competition was as anticipated and that the guidance was accurate:

> [O]n the Q3 call, we indicated that we had [macroeconomic] pressure in June and July that we didn't anticipate. And I think that *now that we've exited August, we've seen a positive shift* in the beginning of a momentum build *that really confirms our assumptions in the guidance for the second half of the year*….I mean, clearly, we factored COVID in. We've seen it for the last several quarters. *We factored the competitive challenges in there. These things pretty much occurred as we had anticipated they would. There was no real surprise*.

¶62

One analyst summarized Defendants' remarks as, "[a]fter previously calling out several macro pressures in June and July, TNDM has seen improvements in August" and reported that "[competitor] Omnipod 5 is not having the same market impact…[and] [i]mportantly TNDM is not seeing any transition of TNDM patients to PODD." ¶64 Another analyst wrote that Defendants "While competitor, Insulet's Omnipod 5, is now available nationwide, Tandem has seen the response they expected, not more. In addition, management clearly stated they are not seeing customer migration from Control-IQ to Omnipod now." ¶65

During a conference on September 13, 2022, Sheridan repeated that following the earlier unanticipated macroeconomic pressure,

> "as we exit the month of August, what we have seen is *we've seen a positive shift.* And we think it's the beginning of the momentum build *that lines up with the guidance that we gave during the call*….[W]e actually saw a very strong renewal performance. So, we're pleased with the results. *And as I said, we think that pretty much lines us up to what we had said in the call regarding guidance for the rest of the year*."

7

¶67 When asked specifically about whether he thought there was a patient "pause" greater than anticipated given the positive new patient trends recently announced by one of their competitors, Sheridan stated,

> "[I]t's not a surprise to us. And I would say that *the level of competition and the effect we're seeing is in line with what our expectations were*. So there's not really a lot of surprises there… And I think that is, *as I said, in line with what we expected, and we think that things will settle down in a quarter or 2*."

¶67

## III.    The Truth Is Revealed

On November 2, 2022, Tandem reported Q3 2022 financial results that were below analyst estimates and revised its 2022 sales guidance to $800-$805 million. ¶50 During the earnings call, Sheridan admitted that the impact of the "competitive environment" had "intensified" since Q2 (*i.e*. prior to issuing the guidance):

> [W]e've largely been pressured by 3 dynamics that continue throughout Q3. First were the pandemic-related pressures that have fluctuated throughout the past 2 years…*The second dynamic is the competitive environment in the U.S.  This intensified across the year*, in line with the competitors scaling launch of a new AID algorithm…[and] the final market dynamic, the impact of the economic environment on customer purchasing behavior…*Overall, the level of pressure from each of these dynamics fluctuated throughout the quarter…*but *has been consistent in aggregate since the latter part of Q2*.

¶51 When specifically pressed by an analyst about competition, Sheridan tried to downplay the impact but ultimately admitted that "it's difficult for us to actually isolate which of the 3 – the factors that we described, the 3 market dynamics are getting worse or getting better." ¶52

Analysts were no longer fooled. In a highly unusual move, one analyst expressly called out Defendants for misleading investors:

> *Management finally took their medicine on revenue guidance* for the year and '23 as well. *Competition is hurting them…*along with some macro

8

pressures though we believe the ***former [competition] is more impactful than they are letting on***….Q3 coming up short on the top-line was ***very surprising as management sounded upbeat during investor conferences towards the end of quarter***. The company's visibility into weekly sales results is clearly poor.

¶54 As a result of these disclosures, Tandem's stock price declined from 30% to $36.77 per share on November 3, 2022. ¶56

## ARGUMENT

### I.    Plaintiffs Adequately Allege Materially Misleading Statements

#### A.    Plaintiffs' Former Employee Allegations Should Be Credited

Defendants publicly stated that business was returning to normal while internally they were combatting increased competition. Plaintiffs rely on allegations from two former Tandem employees to support this claim. Both employees worked at Tandem during the Class Period and both confirmed that competition was not improving but instead worsening and driving down the Company's sales. *See* ¶¶36, 39. These observations were voiced during biweekly team meetings and shared with other senior members of management prior to and during Class Period. ¶37. Notwithstanding the implications of these allegations, Defendants ask the Court to categorically reject them as too "vague" and not "reliable". Def. Br. at 16-17.

Defendants' argument is premised on an incorrect recitation of the law. Courts within the Ninth Circuit routinely "credit the allegations attributed to [confidential witnesses]" where they "form a plausible and coherent narrative" and are "in a position to be personally knowledgeable" of the facts alleged. *See*, *e.g.*, *Okla. Police Pension & Ret. Sys. v. LifeLock, Inc.*, 780 F. App'x 480, 484 n.5 (9th Cir. 2019) (citation omitted). Nothing more is required at the pleading stage. *See In re Quality Sys.*, 865 F.3d 1130, 1145 (9th Cir. 2017) (crediting allegations where "the complaint includes each confidential witness's job description and responsibilities"). As alleged, the FEs were members of the sales force (including a

"territory manager"). ¶¶35, 38. Given their day-to-day roles at the Company, they possess the requisite personal knowledge necessary to support their allegations about the market conditions that existed during the Class Period.[3]

Indeed, FE1 and FE2 recounted similar descriptions of how competition was negatively impacting Tandem's sales and revenue during the third quarter of 2022. *See* ¶¶36, 39. FE1 and FE2 were responsible for selling Tandem's pumps to customers and, therefore, they possess the foundation (*i.e.*, personal knowledge) necessary to discuss the adverse market conditions they faced during the Class Period as well as what was they observed within the Company. *See In re QuantumScape Sec. Class Action Litig.*, 580 F. Supp. 3d 714, 732 (N.D. Cal. 2022) (crediting "unidentified employees" because they "plausibly" knew about testing based on "research and development" roles and were supported by "corroborative nature" of other public statements); *see also Ford v. Nat. Health Trends Corp.*, 2016 U.S. Dist. LEXIS 205908, at *7-8 (C.D. Cal. Dec. 5, 2016) (crediting allegations from confidential "Members" of Chinese multi-level marketing business where plaintiff "'number[ed] each witness and describ[ed] his or her job description and responsibilities'" (quoting *Daou*, 411 F.3d at 1016).

Defendants also overlook the post-Class Period statements that corroborate the information provided by FE1 and FE2. Defendants initially told the market that headwinds from prior quarters had been accounted for and sales had fallen back in

---

[3] The Ninth Circuit's standard for crediting confidential witness allegations comes from *In re Daou Systems, Inc.*, 411 F.3d 1006, 1016 (9th Cir. 2005) (requiring "job description and responsibilities"). Consequently, Defendants misplace reliance on the "substantial specificity" language from *Johnson v. Costco Wholesale Corp.*, 2019 WL 6327580, at *7 (W.D. Wash. Nov. 26, 2019), and are mistaken when they claim that the absence of FE2's dates of employment is a "fatal flaw." Def. Br. at 16-17. In any event, both witnesses worked at Tandem during the Class Period, *i.e.*, FE1 from January 2002 to July 2023 and FE2 from February 2020 to July 2023.

line with normal seasonality, but then abruptly reversed course at the end of the Class Period. *Compare* ¶¶47-48 (statements during mid-quarter analyst conferences regarding "normal seasonality" and "competitive pressure") *with* ¶¶53-55 (analysts reporting that increased competition was "more impactful than they [Tandem] are letting on" and having a "steady impact on the business since the end of 2Q22"). This corroboration bolsters the reliability of the FEs' accounts. *See*, *e.g.*, *Glazer Capital Mgmt., L.P. v. Forescout Techs., Inc.*, 63 F.4th 747, 772-73 (9th Cir. 2023) (statements by CEO "corroborated" plaintiffs' "CW allegations"); *In re Biomarin Pharm. Inc. Sec. Litig.*, 2022 U.S. Dist. LEXIS 9445, at *31-32 (N.D. Cal. Jan. 6, 2022) (crediting allegations from "single source" where executive "publicly admitted" information at issue).

Defendants' reliance on *McGovney* and *Mazzaferro* also fails. In both cases, the plaintiffs' confidential witnesses were not qualified to discuss the broader corporate problems at issue in each case. *See McGovney v. Aerohive Networks*, 2019 U.S. Dist. LEXIS 228702, at *7-11 (N.D. Cal. Aug. 7, 2019) (witnesses had knowledge of layoffs instead of forecasting processes); *Mazzaferro v. Aruba Networks Inc.*, 2015 U.S. Dist. LEXIS 15613, at *7 (N.D. Cal. Feb. 2, 2015) (general statement from "territory manager" about "keep[ing] ship from sinking" did not adequately describe what was causing company losses). By contrast, FE1 and FE2 speak only to their direct observations, which was that Tandem was facing increased competition during the Class Period.

### B.    Misrepresentations That Competition Was "In Line" With Defendants' Prior Expectations

On August 3, 2022, Sheridan said that "competition in the United States…is *in line with our expectations*." ¶58 On September 8, 2022, when analysts questioned the Company's guidance, Sheridan repeated, "*We factored the competitive challenges in there. These things pretty much occurred as we had*

*anticipated they would. There was no real surprise*." ¶62 Then on September 13, 2022, when an analyst again questioned the guidance given a competitor's strong new patient trends, Sheridan repeated, "*the level of competition and the effect we're seeing is in line with what our expectations were*." ¶67 Sheridan repeated, "*as I said, in line with what we expected…*" ¶67

These statements are false and misleading because, as each FE confirmed, competition was negatively impacting sales in Q2 and throughout Q3 more than management had stated, rending the sales guidance unattainable. ¶¶35-39

Refusing to address these statements directly in their brief, Defendants instead point to Appendix A, Def. Br. at 11-12, asserting that these statements are non-actionable opinions. They are wrong. Tellingly, Defendants do not cite a single case for their assertion.

Defendants' assurances that the impact of competition on the Company's sales were "in line" with their prior "expectations" are actionable statements of fact. *See Hatamian v. Advanced Micro Devices, Inc.*, 87 F. Supp. 3d 1149, 1159 (N.D. Cal. 2015) (holding that statement that "nanometer yields are in line with our expectations" was actionable as relating to the "[c]ompany's then-current condition" and false and misleading); *Union Asset Mgmt. Holding AG v. SanDisk Corp.*, 2016 U.S. Dist. LEXIS 15090, at *11 (N.D. Cal. Jan. 22, 2016) (statement that the business performed "in line with our expectations" were actionable because they "referred to past or present conditions").

The "certainty" of these unqualified assertions characterizes them as statements of fact. *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 183 (2015) ("a statement of fact . . . expresses certainty about a thing"). They are "not framed like . . . statement[s] of opinion" as they are not "couch[ed] . . . with prefatory language like 'I believe' or 'In my estimation,'" *Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 176 (2d Cir. 2020). The

12

statement-of-fact inference is especially strong here given Sheridan's reassurances even after being questioned, stating "It's really not the competitive issues" and "We factored the competitive challenges in there." [4]

Defendants next argue that these statements (and others) are not misleading because they do not "impl[y] that competition did not exist or that its impact on Tandem had dissolved." Def. Br. at 14. This misconstrues Plaintiffs' theory of liability. Plaintiffs allege that Defendants' statements were misleading not because they denied competition existed (it exists in every industry) but because they claimed it was "in line" with their expectations. As the FEs confirmed, management refused to revise sales guidance to account for the intensifying competition. *See Electrical Workers IBEW Local 98 Pension Fund v. Best Buy Co.*, 958 F. Supp. 2d 1065, 1076, 2013 BL 207659, at \*10 (D. Minn. 2013) (company's statements that "our earnings are essentially in line with our expectations for the year" were "actionable as a statement of present condition" and false and misleading because the company had experienced consecutive quarters of sales declines).

### C.   Misrepresentations About Macroeconomic Headwinds Impacting Competition

In response to analysts asking if the unanticipated "macroeconomic" headwind had resulted in lost sales to competitors because of the higher cost of Tandem's product, Defendants assured investors that it had not:

---

[4] Defendants assert that the last iteration of these statements is an opinion because it is prefaced by "I would say." Def. App. at 3-4. They cite no authority for their counterintuitive interpretation that this means "I believe" especially given the lack of qualification expressed elsewhere. In any event, it would not transform these historical statements into opinions. *See Fed. Hous. Fin. Agency v. Nomura Holding Am., Inc.*, 104 F. Supp. 3d 441, 565 (S.D.N.Y. 2015) ("the use of the word 'believed' does not transform defendants' representation regarding Fremont's compliance with its underwriting guidelines into a statement of opinion[.]"). Even if this statement (and the others) were an opinion, it would still be actionable. *See infra* Section I.C.

13

- "*we don't see these economic headwinds as anything that would shift people's mindset to a different product*" ¶59;

- "*we don't think that this has anything to do with competitive dynamics*" ¶59; and

- "*It's really not the competitive issues*. It's more of a -- just the macroeconomic factors." ¶59

Defendants incorrectly assert that these are non-actionable opinions. Def. Br. at 11. Purported statements of opinion are still actionable under *Omnicare* if they contain untrue "embedded facts", *Omnicare*, 575 U.S. at 185, or where the information omitted by Defendants "conflicts with what a reasonable investor would take from the statement itself." *Id*. at 189.

Here, FE1 and FE2 each confirmed that Tandem was losing sales to competitors because "inflation and unemployment had increased and the upfront cost of Tandem's pump was greater than pumps being sold by the competition." ¶¶36, 39 This fact was known throughout the sales force and was conveyed to management. ¶¶35-39 Therefore, Defendants' statements, including that the "sales force" never stated that the macroeconomic factor was impacting competition, ¶59 did not "fairly align[] with the information in the issuer's possession at the time." *Omnicare*, 575 U.S. at 189.

### D. Misrepresentations Concerning August "Position Shift" That Confirms Assumptions in The Guidance

On September 8 and 13, 2022, Sheridan told investors that despite the macroeconomic "pressure in June and July" that caused the Company to reduce guidance by approximately $20 million on August 3, 2022, "we've seen a positive shift" in August that "confirms our assumptions in the guidance for the second half of the year" and "lines up with the guidance that we gave during the [August 3, 2022 earnings] call." ¶¶62, 67 These statements were false and misleading because,

14

as confirmed by FE1 and FE2, the impact from competition "intensified" throughout Q3 but management refused to revise forecasts. ¶¶35-39, 51

Defendants assert that this is non-actionable "puffery." Def. Br. at 12. They are wrong. "Puffing statements are optimistic statements by corporate executives that 'are generally not capable of objective verification, and lack a standard against which a reasonable investor could expect them to be pegged.'" *Knox v. Yingli Green Energy Holding Co. Ltd.*, 242 F. Supp. 3d 950, 961 (C.D. Cal. 2017). Here, Defendants' statements of a "positive shift" is verifiable because Defendants directly compare the August conditions to that of June and July as well as to the guidance provided during the August 3 earnings call. *See Jui-Yang Hong v. Extreme Networks, Inc.*, 2017 U.S. Dist. LEXIS 64297, at \*\*38-39 (N.D. Cal. Apr. 27, 2017) (statements that the integration process was "on track" and "ahead of plan" were not puffery because "[E]ach of these statements could have, and should have had, some basis in objective and verifiable fact[,]") citing *Grossman v. Novell, Inc.*, 120 F.3d 1112 , 1123 (10th Cir. 1997) (statement, "we have not slowed down the effort to create new products, we've accelerated it" was not puffery). Even the case upon which Defendants rely held that similar statements were not puffery. *See Barry v. Colony NorthStar, Inc.*, 2019 U.S. Dist. LEXIS 246725, at \*44 n.8 (C.D. Cal. Jan. 24, 2019) ("statements about 'remaining on track' or having a 'cushion' on guidance are verifiable facts and therefore not puffery").

"[N]on-actionable puffing provides a basis for dismissal only where the statement is so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their unimportance." *Knox*, 242 F. Supp. 3d at 962 (citations and quotation marks omitted). Here, sophisticated analysts found Defendants' statements about the "positive shift" and "momentum build" to be so important that they highlighted the statements in their reports:

15

- "[a]fter previously calling out several macro pressures in June and July, TNDM has seen improvements in August…***Importantly*** TNDM is not seeing any transition of TNDM patients to PODD." ¶64
- "the Company clearly said business has strengthened since early August and it appears normal seasonality has begun to kick in" and that "Tandem clearly said they have not seen any elevated competitive pressure beyond what they have anticipated." ¶65

The fact that sophisticated analysts expressly relied on Defendants' statements when issuing their investment advice precludes dismissal at this stage. *See Forescout*, 63 F.4th at 7711 (rejecting "puffery" argument where false information was provided in response to analyst questions); *Extreme Networks,* 2017 U.S. Dist. LEXIS 64297, at *33 ("the Ninth Circuit has noted that investors do not rely on puffery when making investment decisions") (citing *In re Cutera Sec. Litig.*, 610 F.3d 1103, 1111 (9th Cir. 2010)).

### E.   Financial Guidance and Statements Concerning the Headwinds Being Temporary

Defendants wrongly claim that the PSLRA's safe harbor protects their financial guidance. Def. Br. at 9-10. ***First,*** the guidance did not include "meaningful" cautionary language. "Cautionary words about future risk cannot insulate from liability the failure to disclose that the risk has transpired." *In re Countrywide Fin. Corp. Sec. Litig.*, 588 F. Supp. 2d 1132, 1178 n.62 (C.D. Cal. 2008) (citing *Rombach v. Chang*, 355 F.3d 164, 173 (2d Cir. 2004).

In *In re Harman Int'l Indus., Inc. Sec. Litig.*, the complaint alleged that the company made statements concerning expected increased sales and growing inventories, without disclosing that the inventories were actually made up of obsolete versions of the product that the company could not sell profitably. 791 F.3d 90, 273-74 (D.C. Cir. 2015). While the company had disclosed that the product's obsolescence was a factor that could affect its results, the court held that the "cautionary statements were not meaningful because they were misleading in light

16

of historical fact," *id*. at 281, *i.e*., the defendant knew that the cautioned about inventory problems had actually materialized.

In *In re Illumina, Inc.*, the plaintiffs alleged that the company's financial guidance was misleading because defendants failed to disclose that customers had begun moving away from the company's original product to newer versions, which was impacting revenue. 2018 U.S. Dist. LEXIS 10938 (S.D. Cal. Jan. 22, 2018). The court held that the cautionary language that the introduction of "new or enhanced products" could impact results was not "meaningful" because the introduction of new products was a constant in the business and the introduction of the new product at issue had already occurred. *Id*. at *11. The court also found that "actual knowledge" was adequately alleged because, as here, (i) employees of the company had stated that the new product was already impacting sales of the original product, and (ii) after announcing the earnings miss, the company stated that it was "driven by lower than expected [original product] sales, which reflected an increasing customer preference towards the [newer] systems." *Id*. at **13-14.

Here, Tandem's cautionary language concerning competition suffers from the same flaw. The August 3, 2022 guidance release merely identified "the potential that newer products, or other technological breakthroughs for the monitoring, treatment or prevention of diabetes, may render the Company's products obsolete or less desirable." Def. Ex. 5 at 4. The cautionary language in the 10-Ks that Defendants' reference fairs no better, stating only that the Company operates in a competitive market, Def. Ex. 1 at 12, and that "[c]ompetitive products or other technological developments may render our products obsolete or less desirable." *Id*. at 26. *See also id*. at 31. As in *Harman* and *Illumina*, none of the cautionary language discussed the release of the specific new products, much less, disclose that the impact of the competition was already occurring, much worse than anticipated and was rendering sales forecast unattainable.

17

***Second***, Plaintiffs have also adequately alleged actual knowledge. As in *Illumina*, Tandem employees explained that the new competitive products were already impacting sales more than anticipated, and after the earnings miss and guidance reduction on November 2, 2022, Defendants admitted that competition "intensified across the year" and that the pressures that resulted in poor Q3 results and the reduction in guidance "has been consistent in aggregate since the latter part of Q2." ¶51 If the August 3 guidance had indeed taken into account all the headwinds, including competition (as Sheridan claimed), and it had also been consistent since Q2 (before the guidance was issued), then there would have been no need to significantly reduce the guidance on November 2, 2022. Analysts put a finer point on it, stating, "[competition] is more impactful than they're letting on." ¶54 For purposes of the present motion, Plaintiffs adequately allege actual knowledge. *See infra* Section II; *Illumina*, 2018 U.S. Dist. LEXIS 10938, at \*\*12-14 ("to survive this Fed. R. Civ. P. 12(b)6 motion, Plaintiff need not ***prove*** anything…." (emphasis in original)).[5]

## II.   The FAC Adequately Alleges Scienter

Courts must evaluate plaintiffs' scienter allegations holistically, avoiding scrutinizing each allegation in isolation. *Reese v. Malone*, 747 F.3d 557, 580–81 (9th Cir. 2014). The inference of "scienter need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'" *Tellabs*, 551 U.S. at 324. A complaint survives where "a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* If the inferences for and

---

[5] During the August 3, 2022 earnings call, Vosseller stated, "The noise around the competitive launch, particularly right now is more temporary in nature." ¶59 *See also* ¶¶62, 67. These forward-looking statements are actionable for the same reasons as discussed above.

against scienter are in "equipoise," the complaint survives. *Id.* at 331. It is sufficient for plaintiffs to plead "an extreme departure from the standards of ordinary care…that is either known to the defendant or is so obvious that the actor must have been aware of it." *In re VeriFone Holdings, Inc. Sec. Litig.*, 704 F.3d 694, 702 (9th Cir. 2012) (internal quotation marks and citations omitted).

### A.    Plaintiffs Allege a Strong Inference of Scienter

Plaintiffs adequately allege that when Defendants issued the false and misleading statements they knew or were reckless in not knowing that competition was not "in line" with their prior expectations, rendering the guidance too high.

FE1 and FE2 each confirmed that Tandem's sales forecasts and revenue projections during the Class Period did not account for recent negative sales information resulting from competition being provided by the Company's sales force. ¶36 The FEs stated that they as well as other sales force members routinely warned senior management that these market conditions were going to negatively impact the Company's revenue and earnings more than management was willing to admit, identifying specific members of management informed and the meetings at which they were warned. ¶¶36-39 For example, FE1 recalled specifically warning Tandem's Sales Operations Analyst, Darwin Guan, who was responsible for developing the Company's sales targets, ¶36, as well as voicing the warnings during biweekly meetings, however management took no action. ¶37 *See also* ¶39

Defendants assert that these allegations are not sufficient because there is no basis to infer that Defendants themselves knew what the sales force was observing. Def. Br. at 23. This is belied by Defendants' own Class Period representations to investors. On August 3, 2022, Sheridan expressly assured investors that Defendants representations about competition were based on discussions with the sales force:

19

> [I]nside sales organization and our sales force really have active communication dialogue to people who are in the front. And this is what they're hearing. It's really not the competitive issues. ¶59

Where company executives hold themselves out as knowledgeable about an issue of "critical importance" to a company, it is reasonable to assume that the executive either knew or was reckless in not knowing negative information regarding the issue. *Daou,* 411 F.3d at 1022-23 (scienter sufficiently pleaded where the complaint relied on "specific allegations that defendants actually did monitor the data that were the subject of the allegedly false statements"); *Reese v. Malone*, 747 F.3d 557, 577 (9th Cir. 2014) ("The May 2006 statement, which makes references to specific conditions found in the pipeline, strongly suggests [defendant] had access to the disputed information….").

Here, the sale of insulin pumps was essentially Tandem's entire business (¶24), and Defendants identified competition as one of only three "headwinds." Their repeated unprompted discussion of competition, analysts' questions about competition, and Defendants' repeated false reassurances all support an inference of scienter. *See Shenwick v. Twitter*, 282 F.Supp.3d 1115, 1145 (N.D. Cal. 2017) (given that Twitter described "daily active users" and "monthly active users" as one of five "major growth drivers", "it would be absurd for [defendants] not to have been aware of adverse DAU trends during the class period, or to have misunderstood the interaction between DAU and MAU"); *Noto v. 22nd Century Grp., Inc.*, 2023 WL 122305, at *9 (W.D.N.Y. Jan. 6, 2023) (scienter "is further strengthened when circumstances indicate that public statements were made to placate the market in response to inquiries about [the relevant issue]") (collecting cases).[6] Indeed, an inference is not even needed to infer Defendants' knowledge

---

[6] *See also In re Gen. Elec. Co. Sec. Litig*., 857 F. Supp. 2d 367, 395-96 (S.D.N.Y. 2012) ("highly improbable" that defendant who publicly described company's

20

here because they expressly admitted to having an "active communication dialogue" with the sales force on the "front" lines. ¶59 Defendants cannot point to the sales force as a basis for knowing that competition is not impacting results and then deny knowing that the sales force was saying the exact opposite. *See S. Ferry LP # 2 v. Killinger*, 687 F. Supp. 2d 1248, 1257 (W.D. Wash. 2009) (scienter alleged under "core operations" doctrine where the CEO made "public statements that assured the public that senior management remained informed" of the relevant issue); *City of Livonia Employees Ret. Sys. v. Wyeth*, 2010 U.S. Dist. LEXIS 107729, at *6, *18-19 (S.D.N.Y. Sept. 29, 2010) (scienter alleged where executive "presented himself as knowledgeable about the status and results of [the company's] clinical trials and the [New Drug Application]" for a product of "critical importance").[7]

Tandem's performance relative to its main competitors further supports Plaintiffs' theory of scienter (¶78), as it undermines Defendants' claim that "macroeconomic" factors were responsible for the Company's poor performance. Def. Br. at 22. ***First***, by definition, "macro"economic factors generally impact members of an industry similarly. Moreover, when addressing this factor, Defendants expressly disclaimed the possibility that this factor was harming Tandem more than their competitors. ¶59 ***Second***, Plaintiffs do not allege that

---

finances did not inquire into basis for statements); *In re MBIA, Inc., Sec. Litig.*, 700 F. Supp. 2d 566, 591 (S.D.N.Y. 2010) ("Defendants cannot maintain that its officers repeatedly disclosed the RMBS content of the CDOs-squared to the market, but that none of its officers were aware of the RMBS backing the CDOs-squared).

[7] The cases upon which Defendants rely, Def. Br. at 23-24, are inapposite as they all involve conclusory allegations about what management must have known. Here, the FEs identify specific meetings and individuals that were informed, either by name or position, and each confirms that the "competitive environment…intensified" throughout the Class Period (¶51), and Defendants themselves represented that management was informed about the sales force's observations on competition.

21

Defendants had to "decode" anything. Rather, the stock price movement at the end of the Class Period confirms what the FEs observed, and Defendants already knew, that competition had been intensifying since Q2 with Tandem's main competition enjoying significant wins. ¶¶51, 78

**B.    The Short Time Between Defendant's Reaffirmance of Guidance and The Massive Reduction Supports and Inference of Scienter**

It is settled Ninth Circuit precedent that the passage of just a short period of time between executives' rosy statements about their company's prospects and a downturn in those prospects is "circumstantial evidence" that the challenged statements "were false when made." *Fecht v. Price Co.*, 70 F.3d 1078, 1083 (9th Cir. 1995) (short time (eleven weeks) between positive statement and revelation of contrary truth was circumstantial evidence of falsity) *cert. denied*, 134 L. Ed. 2d 547, 116 S. Ct. 1422 (1996).

Here, with only three weeks before the end of Q3, Defendants reaffirmed their guidance and confirmed that competition was "in line" with expectations, only to thereafter significantly reduced the guidance on November 2, 2022. This not only supports scienter, but also the Ninth Circuit has directed that such shortness of time be given "more weight" because there was no "intervening catastrophic event" that might suggest that the executives' earlier statements may not have been false. *Fecht*, 70 F.3d at 1084. *See In re Grand Casinos, Sec. Litig*., 988 F. Supp. 1273, 1283 (D. Minn. 1997) ("given the short time frame" (three months) between positive statements about the company's financial outlook and revelation of poor results "it is reasonable to infer that management was on notice of these problems during the class period…[and] create a strong inference that defendants knew there were significant problems when the statements were made"); *See Fla. State Bd. of Admin. v. Green Tree Fin. Corp.*, 270 F.3d 645, 666 (8th Cir. 2001) ("[T]he sheer size of the . . . write-down adds to the inference that defendants must have been aware the

22

problem was brewing"); *Brasher v. Broadwind Energy, Inc.,* 2012 U.S. Dist. LEXIS 55194, at *67 (N.D. Ill. Apr. 19, 2012) ("What gets Plaintiffs across the "strong inference" line is the timing and scale of the impairment write-downs. … Losses of this size do not fall out of the sky").

### C. Plaintiffs' Theory Is Consistent with An Inference of Scienter

Defendants assert that Plaintiffs' theory of liability does not explain why Defendants would not have come clean earlier about the impact competition was having on sales. Def. Br. at 20-21. It is obvious. Having previously reduced guidance, which resulted in a large stock price decline, Defendants had hoped against hope that despite poor sales trends being reported throughout the sales force, the Company would see a late surge in sales, perhaps through the improving renewals, that would save them. Defendants recklessly rolled the dice at the expense of investors purchasing Tandem stock. ¶¶2, 69

### D. The FAC Adequately Alleges Corporate Scienter

"[T]he collective scienter (or corporate scienter) doctrine recognizes that it is possible to raise the inference of scienter without doing so for a specific individual." *In re NVIDIA Corp. Sec. Litig.*, 768 F.3d 1046, 1063 (9th Cir. 2014) cert. denied *sub nom. Cohen v. Nvidia Corp.*, 135 S. Ct. 2349 (2015). The Ninth Circuit has "opined that the doctrine might be appropriate in some cases . . . circumstances in which a company's public statements were so important and so dramatically false that they would create a strong inference that at least some corporate officials knew of the falsity upon publication." *Id.*

Here, facts supporting such corporate scienter include the critical importance of insulin pumps sales as well as competition during the Class Period, that the FEs stated that the competition problem was known company-wide, and Defendants' statements that the sales force had been asked about competition. *See Makor Issues & Rights, Ltd. V. Tellabs Inc.*, 513 F.3d 702, 709 (7th Cir. 2008) (because the

23

allegations concerned the company's most important products, the court found it "very hard to credit" the assertion that "no member of [Tellabs] senior management who was involved in authorizing or making public statements about the demand for the [key products] knew that they were false . . . .").

### E.    The Inference of Scienter Is At Least As Plausible as Any Nonculpable Explanation

At bottom, the question is whether the inference that Defendants recklessly misled investors as to Tandem's financial prospects with only three weeks left in Q3 is "at least as compelling" as Defendants' assertion that they were completely blindsided by the need to massively slash the guidance they affirmed mere weeks earlier. *Tellabs*, 551 U.S. at 324 (2007). As Judge Lorenz recently explained under similar circumstances:

> Defendants are correct. Plaintiff has not proven that Defendants had actual knowledge that they would fail to hit their earnings guidance. It is possible that Defendants believed they could hit their earnings forecast notwithstanding lower [] sales. However, to survive this Fed. R. Civ. P. 12(b)6 motion, Plaintiff need not prove anything. It is sufficient if Plaintiff plausibly alleges facts showing that deliberate recklessness or an intention to deceive is no less likely an explanation of Defendants' motivation than an innocent explanation… Plaintiff's complaint accomplishes this much.

*Illumina*, 2018 U.S. Dist. LEXIS 10938, at **12-14.

## III.   The FAC Adequately Alleges Loss Causation

Defendants assert that the November 2, 2022 announcement cannot be the basis for loss causation because Defendants did not admit the reduction in guidance was due to competition. Def. Br. at 25. They are wrong on the facts and the law.

A "corrective disclosure" need not be a *mea culpa* by the Defendants. Rather, it can "come from any source, including…***analysts***…[and it] 'need not precisely mirror the earlier misrepresentation.' It is enough if the disclosure reveals some new

24

facts that, taken as true, render some aspect of the defendant's prior statements false or misleading." *In re BofI Holding, Inc. Sec. Litig.*, 977 F.3d 781, 790 (9th Cir. 2020), *cert. denied*, 142 S. Ct. 71 (2021) (citations omitted).

Plaintiffs allege Defendants concealed that competition was impacting sales more than anticipated, rending Defendants' revenue guidance too high. Assuming Plaintiffs' allegations are true, the reduction in revenue guidance because of lower sales adequately alleges loss causation. Defendants admitted that competition was a factor in reducing the guidance, which was confirmed by the stock price movements of competitors and the evaluation of sophisticated analysts. ¶¶78-80. "The Ninth Circuit has held that when 'analysts note[] the probable relationship between' alleged misstatements and a stock price decline, plaintiffs have adequately pleaded loss causation." *Leventhal v. Chegg, Inc*., 2024 U.S. Dist. LEXIS 37562, at *27 (N.D. Cal. Mar. 4, 2024) (citation omitted).[8]

## IV.    Plaintiffs Adequately Allege a Section 20(a) Claim

Conceding the issue of control, Defendants only argue in a single sentence that this claim cannot stand because Plaintiffs fail to plead a primary violation. Def. Br. at 25. They are wrong. *See Forescout*, 63 F.4th at 781 (reversing dismissal of control person claim when complaint adequately pleads primary violation).

---

[8] Defendants' request for dismissal at the pleading stage is contradicted by their own cited case. In *In re Novatel Wireless Sec. Litig.*, the court ***denied*** <u>summary judgment</u>, relying on the conclusions of analysts to support loss causation. 830 F. Supp. 2d 996, 1020 (S.D. Cal. 2011). The other case upon which Defendants rely is inapposite. *Inchen Huang v. Higgins*, 2019 U.S. Dist. LEXIS 44165, at *48 (N.D. Cal. Mar. 18, 2019) (loss causation not alleged where there was no alleged connection between the company's off-label marketing and the decline in stock price where prescriptions were actually increasing).

Dated: March 27, 2024

Respectfully Submitted,

**POMERANTZ LLP**

*/s/Michael J. Wernke*
Michael J. Wernke (*pro hac vice*)
Email: mwernke@pomlaw.com
600 Third Avenue, 20th Floor
New York, NY 10016
Tel.: (212) 661-1100

-and-

**POMERANTZ LLP**
Jennifer Pafiti (SBN 282790)
Email: jpafiti@pomlaw.com
1100 Glendon Avenue, 15th Floor
Los Angeles, CA 90024
Tel.: (310) 405-7190

-and-

**LEVI & KORSINSKY, LLP**
Adam M. Apton (SBN 316506)
Email: aapton@zlk.com
445 South Figueroa Street, 31st Floor
Los Angeles, CA 90071
Tel.: (213) 985-7290

*Attorneys for Co-Lead Plaintiffs*
*and Co-Lead Counsel for the Class*

**BRONSTEIN, GEWIRTZ &**
  **GROSSMAN, LLC**
Peretz Bronstein
Email: peretz@bgandg.com
60 East 42nd Street, Suite 4600

26

New York, NY 10165
Tel: (212) 697-6484

*Additional Counsel for Co-Lead Plaintiffs*
*Thomas O. Martel and Linna Rae Martel*